# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
HTC G2 cellular phone, IMEI 359116037381770, bearing )   17-1437-M
serial number SH0CSR203960 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____Eastern_____ District of _____Pennsylvania_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy. |
| 18 U.S.C. § 924(j) | Murder in the Course of a Drug Trafficking Crime |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matt Yaeger, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/24/17__

_____
*Judge's signature*

City and state:  Philadelphia, PA

Hon. Jacob P. Hart, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Matthew Yaeger, being duly sworn under oath and deposed, state the following:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Philadelphia, Pennsylvania Division. I have been a Special Agent of the FBI for more than 11 years. I am currently assigned to the Philadelphia Violent Crime squad and have been for approximately the past 3 years. For the previous 5 years, I was assigned to the Organized Crime squad. For approximately 3.5 years prior to that, I was assigned to the Violent Crimes/Major Offenders squad in the FBI's Milwaukee, Wisconsin Division. In the course of my work, I have investigated violations of federal law being committed by violent offenders and criminal organizations, including murders, robberies, drug offenses, racketeering, gambling offenses, firearms offenses, and money laundering offenses.

2.     This affidavit is being submitted in support of an application for a search warrant for: an HTC G2 cell phone, IMEI 359116037381770, serial number SH0CSR203960, containing a Kingston 8GB microSD memory card and a T-Mobile SIM card, currently located at the FBI Philadelphia Division and assigned evidence item number 1B75 in FBI case 209A-PH-109603. The items to be seized pursuant to the search warrant are more fully described in Attachment A to the warrant.

3.     This affidavit is based upon my personal knowledge, experience and investigation, as well as information related to me directly or through reports of other FBI agents, FBI task force officers, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) investigators, Drug Enforcement Administration (DEA) investigators, Philadelphia Police Department (PPD) officers, and other law enforcement officers in the course of their official duties. Throughout this affidavit, reference will be made to "agents," referring to those federal,

1

state and local law enforcement officers who have directly participated in the investigation, and with whom I have had regular contact.

4.    Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included all information known by me or other agents concerning this investigation. I have set forth only those facts that I believe are essential to establish the necessary foundation for the search warrant. This affidavit does not exhaust my knowledge or that of other agents of the facts and circumstances surrounding this investigation.

5.    This investigation has determined that ANTHONY VETRI, MITESH PATEL, MICHAEL VANDERGRIFT, MICHAEL MANGOLD, ALLEN CARTER and others known and as yet unknown, were engaged in a large-scale Oxycodone distribution ring, in violation of 21 U.S.C. § 846 (conspiracy to distribute controlled substances). As part of the conspiracy, VETRI, VANDERGRIFT, MANGOLD and CARTER committed, aided and abetted and/or acted as accessories to the murder of another member of the conspiracy (GBOLAHAN OLABODE), in violation of 18 U.S.C. § 924(j) (murder in the course of using and carrying a firearm during and in relation to a drug trafficking crime).

6.    Oxycodone is a Schedule II controlled substance under the Controlled Substances Act (21 U.S.C. § 801, *et seq.*). As such, the only way for a pharmacy to legally dispense Oxycodone is upon receipt of a prescription that was issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. (*See* 21 C.F.R. § 1306.04(a).)

7.    Based on numerous interviews and a review of financial records, business records, police reports and electronic evidence, I am aware of the following: MITESH PATEL was a licensed pharmacist who operated multiple pharmacies, including Dava Pharmacy in

2

Lansdowne, Pennsylvania (PA) and Welsh Pharmacy in Philadelphia, PA.  GBOLAHAN

OLABODE, a.k.a. "Bo," who was not a licensed pharmacist, was PATEL's "silent partner" in

the pharmacies.  Multiple cooperating witnesses in this investigation stated that PATEL illegally

distributed Oxycodone 30 milligram (mg) pills from his pharmacies.  For example, Cooperating

Witness 1 (CW1) provided the following information:

    a.    PATEL provided CW1 with Oxycodone 30mg pills in order for CW1 to resell

them.[1]  Beginning in approximately 2008, PATEL gave CW1 one to three

bottles of Oxycodone 30mg pills at a time, one to three times per month.  The

frequency with which CW1 received pills and the quantities of pills he

received varied over time.

    b.    CW1 would resell the pills, take $100 for himself and give the remaining

proceeds to PATEL.  The bottles were not the amber-colored prescription

bottles that pharmacies typically provide to customers.  Instead, the bottles

were white and had a foil seal on the top.

    c.    Sometimes CW1 gave PATEL fraudulent prescriptions to cover the

transaction; other times, PATEL gave the pills to CW1 without any

prescription.

    d.    At some point, PATEL stopped contacting CW1 for a period of time.  At

some point after Olabode was killed, PATEL asked CW1 to resume selling

pills.  From that point until approximately June 2013, PATEL provided pills

to CW1 for resale, in a manner similar to their previous dealings.

---

[1] CW1 has not been charged with a crime for his dealings with PATEL.  CW1 provided information to law
enforcement during multiple interviews and testified under oath before a federal grand jury.  The information
presented in this affidavit is a summary of the information CW1 provided.  I believe CW1's information to be
truthful and reliable, as it has been corroborated by other witnesses, financial records and bank surveillance video.

e.    On occasion and at PATEL's instruction, CW1 would deposit the proceeds of
the drug sales into a bank account PATEL controlled (as opposed to
delivering the money to PATEL directly).

8.    Evidence gathered in this investigation shows that, as of early-to-mid 2009,
PATEL was illegally supplying Oxycodone pills to GBOLAHAN OLABODE and ANTHONY
VETRI (in addition to CW1).  For example, Cooperating Witness 2 (CW2) provided the
following information:

a.    VETRI supplied CW2 with large quantities of Oxycodone 30mg pills,
beginning in approximately 2008.[2]  The pills VETRI provided to CW2 were
in sealed bottles, with 100 pills in each bottle.  To help CW2 sell the pills he
was receiving from VETRI, CW2 contacted MICHAEL VANDERGRIFT and
ALLEN CARTER, who he knew from childhood.  VANDERGRIFT would
set up the sales, sell some himself, and have CARTER distribute the rest.

b.    After dealing with VANDERGRIFT for approximately four to six months,
CW2 began supplying VANDERGRIFT with more pills - their transactions
went from 100-200 pills every other week to 500-600 pills each week.
However, VETRI's sales to CW2 were inconsistent, and CW2 had trouble

---

[2] CW2's sister is currently engaged to ANTHONY VETRI. CW2 was convicted in the Southern District of Florida of Attempting to Possess With Intent To Distribute Oxycodone, stemming from the Oxycodone distribution with his Florida supplier. CW2 was sentenced to 51 months incarceration originally, but the sentence was later reduced to 41 months after the United States Sentencing Commission reduced the guidelines for CW2's offense. CW2 has completed his period of incarceration. CW2 has not been charged for his drug distribution with VETRI and PATEL. In addition, CW2 was not charged for his role in arranging for VANDERGRIFT and MANGOLD to rob one of CW2's former drug customers (CW2 told the government that VANDERGRIFT committed the robbery, but CW2 initially did not disclose his own involvement; CW2 later admitted his role in the robbery). CW2 has received an informal immunity agreement relating to these offenses. CW2 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW2 provided. I believe CW2's information to be truthful and reliable, as it has been corroborated by other witnesses, police reports and other evidence. In addition, CW2 testified under oath before a federal grand jury. If CW2 were to perjure himself, it would not be covered by his immunity agreement and he would be exposed to criminal liability.

moving the pills during a period of time that VANDERGRIFT was in jail,
which CW2 believed to be for more than a year (Affiant's Note:
VANDERGRIFT was in jail for a period of time starting around July 2009
and ending in September 2010).

c.      Initially, VETRI sold the pills to CW2 for $14 per pill, but VETRI dropped
his price to $11 or $12 per pill after CW2 complained that he was not making
any money.  CW2 paid VETRI up front for the pills he received from VETRI.
CW2 in turn sold the pills to VANDERGRIFT for $15 per pill.

d.      VETRI told CW2 that PATEL, owner of Dava Pharmacy, was his supplier,
and that he was supplying VETRI with 2,400 pills every week to every other
week.  CW2 knew that VETRI and PATEL initially were illegally selling
Percocet 10mg pills, but that they weren't making enough money, so they
began selling large quantities of Oxycodone 30mg.  PATEL sold the
Oxycodone to VETRI, who gave most of what he received to CW2 to sell.

e.      CW2 stated that VETRI was inconsistent in getting the Oxycodone from
PATEL, which led CW2 to find a second source of supply.  Accordingly, in
late-2009 or early winter of 2010, CW2 developed a source of Oxycodone
30mg pills in Florida, and also distributed the pills he received from his
Florida source through VANDERGRIFT and CARTER.  After CW2 obtained
his Florida source of supply, CW2 still received pills from VETRI on several
occasions.  The last time VETRI provided pills to CW2 was at the end of 2010
or beginning of 2011.

f.      CW2 received the Oxycodone from VETRI at VETRI's residence, which was located in Essington, PA at the time.  CW2 met PATEL approximately eight to nine times at VETRI's residence.  During the times that CW2 was at VETRI's residence, CW2 saw PATEL come into the residence carrying a bag.  Each time, VETRI went into another room with PATEL, and then PATEL would leave and VETRI would come out and remove manufacturer's bottles of Oxycodone 30mg from the bag PATEL had brought into VETRI's home.  VETRI would then take the pills out of the manufacturer's bottles and put them into a large plastic bag for CW2 so that he could hide them.

g.      CW2 stated that VETRI told him that PATEL and GBOLAHAN OLABODE were business partners in Dava Pharmacy together.  VETRI told CW2 that OLABODE was purchasing Oxycodone from PATEL, and that the reason VETRI couldn't get more pills from PATEL was that OLABODE was paying PATEL more money for the pills.

h.      CW2 stated that after about a year of receiving Oxycodone from his Florida source, CW2, VANDERGRIFT and CARTER were stopped by DEA when they were flying to deliver money to CW2's Florida source to purchase Oxycodone.  Approximately $40,000, being carried in parts by each of them, was seized from them by DEA (Affiant's Note: Your affiant knows that on February 10, 2011, pursuant to a consensual encounter with CARTER, VANDERGRIFT, and CW2 at the Fort Lauderdale-Hollywood International Airport, DEA agents/officers seized $15,040 from CARTER, $15,040 from VANDERGRIFT, and $11,690 from CW2).

6

    i.    CW2 believes that after he was stopped at the airport, no one would deal with him out of fear that he was cooperating with DEA. Thereafter, CW2 believed that VANDERGRIFT began getting pills directly from VETRI, who was still getting them from PATEL.

9.    Cooperating Witness 3 (CW3) received a large amount of Oxycodone pills from OLABODE. CW3 provided the following information:

    a.    CW3 stated that he became friendly with OLABODE because OLABODE was a bouncer at a nightclub that CW3 frequented.[3] CW3 also worked out at the same gym as OLABODE. CW3 knew that OLABODE was involved in bodybuilding and took illegal steroids to supplement his workouts. CW3 also knew OLABODE to illegally sell human growth hormone (HGH) because he purchased HGH from OLABODE on several occasions.

    b.    In or around February 2010, CW3 approached OLABODE and asked OLABODE if CW3 could illegally obtain Oxycodone pills from OLABODE, some of which CW3 intended to use personally and the rest of which he intended to sell to support his addiction to Oxycodone. OLABODE sold CW3 eight to 12 bottles of Oxycodone 30mg pills at first. During later transactions, OLABODE "fronted" CW3 multiple bottles of pills at a time, and CW3 paid OLABODE after he sold the pills. The pills that OLABODE provided to

---

[3] CW3 stated he cooperated with law enforcement, even though it exposed him to criminal liability, in an effort to help solve the murder of OLABODE, who was CW3's friend. CW3 has not been charged for his drug distribution with OLABODE. CW3 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW3 provided. I believe CW3's information to be truthful and reliable, as it has been corroborated by other witnesses.

7

CW3 were still in their manufacturer's bottle, each of which contained 100 pills.

c.     CW3 obtained pills from OLABODE for approximately 2 years (beginning in approximately February 2010). During that time period, CW3 and OLABODE occasionally took breaks from dealing with one another. During the times when CW3 got pills from OLABODE, CW3 received multiple bottles of 100-count pills at a time.

d.     CW3 stated that there was an occasion when OLABODE gave him an entire case of Oxycodone 30mg pills. The case had the name of the pharmacy from which it came along with a sticker price on the bottles. CW3 says that he did not know the name of the pharmacy, but knows that it was in Lansdowne, PA. (Affiant's Note: An employee at Amerisource Bergen, one of the wholesale suppliers of Oxycodone 30mg pills for Lansdowne and Welsh Pharmacies, informed agents that Amerisource receives Oxycodone 30mg pills in several ways, including in a case of 24 loose bottles; 12 loose bottles; 24 bottles shrink-wrapped in two 12-bottle increments; and 48 bottles shrink-wrapped in eight six-bottle increments. When shipping out the packages to their customers, they might keep the integrity of the initial packaging depending on the number of bottles ordered.)

e.     OLABODE told CW3 that he had a partner with whom he had to split the money (meaning the money he made from selling pills). CW3 stated he later learned that OLABODE was a partner in a pharmacy with an individual named "Mitesh" (known by agents to be MITESH PATEL).

8

    f.      Prior to getting pills from OLABODE, CW3 got pills from CW2. CW3 believed CW2 received his pills from ANTHONY VETRI.

10.     On January 4, 2012, OLABODE was murdered outside of his home in Lansdowne, PA. Shortly after OLABODE got out of his car, two males approached him and shot him numerous times. Law enforcement recovered 27 spent shell casings from the scene – 15 from a .40 caliber gun and 12 from a 9 millimeter (mm) gun. Based on information obtained from, among other sources, multiple cooperating witnesses and a review of electronic devices used by VETRI and VANDERGRIFT, agents learned that VANDERGRIFT and MANGOLD shot and killed OLABODE on January 4, 2012. CARTER was with them that evening, but not present at the time of the shooting. They carried out the murder at the request of VETRI, who wanted OLABODE murdered so that he would receive a larger supply of pills from PATEL. VETRI gave VANDERGRIFT information about OLABODE and promised to supply him with Oxycodone pills for resale at a reduced price as payment for the murder. For example, CW4 provided the following information[4]:

    a.      CW4 grew up with VANDERGRIFT. CW4 and VANDERGRIFT were cellmates at the Philadelphia Federal Detention Center (FDC) for approximately 2 months, and were housed in the same unit for another 4 to 5 months after that. During these months together, VANDERGRIFT told CW4 details about a murder he committed. The following is a summary of the

---

[4] CW4 has been convicted of Distribution of Oxycodone in the Eastern District of Pennsylvania, and is currently awaiting sentencing. CW4 has cooperated with the government in an effort to reduce his exposure at the time of sentencing. CW4 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW4 provided. I believe CW4's information to be truthful and reliable, as it has been corroborated by other witnesses and other evidence.

9

information VANDERGRIFT told CW4. Unless otherwise indicated, all of the information was told to CW4 by VANDERGRIFT.

b.  VANDERGRIFT and "White Mike" (MIKE MANGOLD) killed a man named "Bo" (GBOLAHAN OLABODE).  The murder happened shortly after New Year's (maybe January 4) in Lansdowne, Pennsylvania.  They killed him in a parking lot behind his home after he got out of his car.  VANDERGRIFT and MANGOLD shot at Bo 28 or 29 times, and hit him 13 or 14 times.

c.  VANDERGRIFT used a 9mm handgun and MANGOLD used a .40 caliber handgun during the murder.  CARTER's cousin straw-purchased the 9mm handgun for VANDERGRIFT.  VANDERGRIFT and MANGOLD got the .40 caliber handgun when they burglarized the house where Nick Dellapolla was living.  After the murder, they swapped the guns in deals that were set up by TRG gang members that MANGOLD knew.  TRG is an Asian gang in South Philadelphia. [5]

d.  VANDERGRIFT committed the murder because ANTHONY VETRI told him that he would make money through pill sales (Oxycodone 30mg pills). VETRI was a pill dealer that VANDERGRIFT knew.  VETRI was friends with a pharmacist who was an Indian male.  [NOTE: CW4 stated VANDERGRIFT told him the pharmacist's name, but CW4 forgot it.  Agents know the pharmacist to be MITESH PATEL.  To avoid confusion, he will be

---

[5] Police reports indicate that the burglary/gun theft occurred on November 20, 2011. CW3 owned the house and it was CW3's gun that was stolen during the burglary – a .40 caliber Taurus handgun, serial number SYL61919.  On October 21, 2015, the Philadelphia Police Department recovered CW3's gun during a traffic stop in South Philadelphia (the individuals in the car are not believed to be related to this investigation).  A ballistic examination was conducted, and it was determined that the .40 caliber shell casings found at the scene of OLABODE's murder were fired from CW3's stolen gun.

referred to as PATEL hereinafter, even though CW4 did not recall his name during the interview.] Bo was partners with the pharmacist and Bo was selling pills to Nick Dellapolla and CW3. VETRI told VANDERGRIFT that if he killed Bo, the pharmacist would sell the pills to VETRI. VANDERGRIFT told CW4 that VETRI had supplied pills to CW2, and that CW2 had supplied pills to VANDERGRIFT.

e.    VETRI told VANDERGRIFT he would sell the pills to VANDERGRIFT at a "good price" or "nice price" (VANDERGRIFT did not tell CW4 a dollar figure). VANDERGRIFT would then sell the pills and make a profit. VETRI came to VANDERGRIFT's house a day or two before the murder and said he'd give VANDERGRIFT a better price on the pills than they had previously discussed, but the murder has to happen now. VANDERGRIFT did not say why VETRI wanted Bo killed so urgently.

f.    VETRI told VANDERGRIFT everything about Bo, including his address. Bo was an African male (CW4 believes VANDERGRIFT said Bo was Nigerian, but CW4 is not positive). Bo was a large man and was known to carry a gun (which is why they didn't try to rob him). Bo's home was a duplex with apartments, and he lived at the top of a fire escape. Bo drove an Infiniti. For that reason, VANDERGRIFT and MANGOLD got Infiniti tattoos on their necks after the murder.[6]

---

[6] I am aware that VANDERGRIFT and MANGOLD both got tattoos of the Infiniti logo following the murder. MANGOLD has since covered his Infiniti logo with other tattoos.

g.      VANDERGRIFT waited for VETRI to get pills from PATEL, but VANDERGRIFT ended up getting arrested about 1 week after the murder.[7] At the time, VANDERGRIFT was living in a house that VETRI owned in Chester, on 22nd or 23rd Street. When VANDERGRIFT was in jail, VETRI let VANDERGRIFT's girlfriend live in the house rent free because VANDERGRIFT and VETRI plotted the murder together.[8]

h.      VANDERGRIFT also told CW4 about several armed robberies he committed, including the robbery of one of CW2's drug customers.[9]

11.      MICHAEL MANGOLD has pled guilty to an Information charging him with, among other offenses, violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 18 U.S.C. § 924(j) (murder in the course of using and carrying a firearm during and in relation to a drug trafficking crime). ALLEN CARTER has pled guilty to an Information charging him with, among other offenses, violations of 21 U.S.C. § 846 and 18 U.S.C. § 3 (accessory after the fact to murder). MANGOLD and CARTER have admitted their participation in the murder of OLABODE and have provided detailed descriptions of VANDERGRIFT and VETRI's roles in the murders (their descriptions are similar to the description provided by CW4).

12.      On May 31, 2017, a federal grand jury in the Eastern District of Pennsylvania returned a Second Superseding Indictment, charging VETRI, PATEL and VANDERGRIFT with

---

[7] VANDERGRIFT was arrested on January 19, 2012 (the murder was on January 4, 2012).

[8] VANDERGRIFT's girlfriend (Larae Laws) testified before a federal grand jury that she did not pay rent to VETRI from the time that VANDERGRIFT was arrested (January 19, 2012) until the time she moved out (June 2013).

[9] In relation to this robbery, VANDERGRIFT has been charged in a separate indictment with violations of 18 U.S.C. §§ 1951 (Hobbs Act robbery), 924(c) (use of a firearm during and in relation to a crime of violence) and 922(g) (felon in possession of a firearm). (*See also* Footnote 2, *supra*.)

violations of 21 U.S.C. § 846; charging VETRI and VANDERGRIFT with violations of 18 U.S.C. § 924(j); and charging PATEL with tax and money laundering offenses.

13.     On January 19, 2012, MANGOLD, VANDERGRIFT and CARTER were arrested by Pennsylvania State Police Troopers during a traffic stop. The arresting officers seized phones belonging to the subjects.[10] VANDERGRIFT's phone was identified as an HTC G2 cell phone, IMEI 359116037381770, serial number SH0CSR203960, containing a Kingston 8GB microSD memory card and a T-Mobile SIM card (hereinafter referred to as the "Subject Telephone").

14.     The ATF subsequently took possession of the Subject Telephone and executed a federal search warrant on it. The phone number assigned to the Subject Telephone was 215-917-4361, which is a phone number that VANDERGRIFT used during times relevant to this investigation. In the phone, agents located multiple text messages that appeared to be related to robberies and other crimes VANDERGRIFT committed. Several of those text messages were sent from the Subject Telephone to the Subject Telephone. Based on my training and experience, I am aware that people sometimes send text messages from their phone to themselves in an effort to document information (similar to writing information in a "Notes" file on the phone, or to writing down a hard-copy list on a piece of paper).

15.     One of the text messages that was sent from the Subject Telephone to the Subject Telephone was on November 21, 2011, and stated "Gbm6932..benz". I am aware that, as of November 2011, one of OLABODE's cars was a 2007 Mercedes Benz SLK55 AMG, bearing Pennsylvania license plate GMB6902. I believe that VANDERGRIFT was "scoping out"

---

[10] The arresting officers also recovered one firearm each from MANGOLD, VANDERGRIFT and CARTER. At the time, MANGOLD, VANDERGRIFT and CARTER were all convicted felons (i.e., they had been convicted of a crime punishable by imprisonment for a term exceeding one year), and were therefore not eligible to possess firearms.

13

OLABODE prior to the murder and sent the message to himself in an effort to store

OLABODE's vehicle information, but he made slight errors in the license plate number.

16.     In the Subject Telephone's SD card, agents located an image file depicting the

front of OLABODE's house and two image files that appeared to depict OLABODE's cars in the

parking lot behind his house (an Infiniti SUV and a Mercedes Benz sedan).  The images of the

house and Infiniti indicate they were "created" on November 22, 2011, and the image of the

Mercedes Benz indicates it was "accessed" on November 21, 2011 and "created" on December

28, 2011.

17.     The ATF executed the search warrant on the Subject Telephone in May and July

2012, using software that was available at the time to extract data from the phone.  One of the

purposes of this new proposed search warrant is to use newer, updated software to search the

phone.  I have spoken to a Senior Forensic Examiner (SFE) who works for the FBI's

Philadelphia Regional Computer Forensics Laboratory.  The SFE, who frequently conducts

forensic examinations of electronic devices such as cellular phones, informed me that the

software tools used to extract data from electronic devices are updated regularly, and that

forensic examiners are sometimes able to use updated software to recover additional data they

were not previously able to recover using older software.  For example, the SFE has informed me

that newer software may allow a forensic examiner to recover additional information about the

dates and times when the images on VANDERGRIFT's SD card were taken.

18.     The Subject Telephone is currently located at the FBI Philadelphia Division and

assigned evidence item number 1B75 in FBI case 209A-PH-109603.

19.     The Subject Telephone is a wireless telephone.  Based on my training and

experience, as well as the training and experience of other agents, a wireless telephone (or

14

mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing email, voice messages and text messages[11]; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device and for mapping and navigation features. Based on my training and experience, I am aware that people who engage in illegal activities such as robberies have been known to use some or all of these features in furtherance of their illegal activities.

20.    Furthermore, based on my training and experience, I know that electronic devices such as cell phones can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensic tools. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

---

[11] Based on my training and experience, I am aware that, among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging" (collectively referred to in this affidavit as "text messages").

21.     Based on my training and experience, I know that people who engage in crimes such as robbery and murder will often communicate with their coconspirators and/or accomplices by way of cellular telephone (including via text message) before, during, and after the commission of a crime. Further, I am aware that people who engage in robberies and murders will often use the internet (including on their cell phones) to search for information about their intended victims, such as the locations and hours of businesses. Further, I am aware that people who engage in robberies and murders often possess photographs (including in their phones) of themselves and their coconspirators/accomplices; the victims of their crimes; clothing worn during the crimes; weapons and other items used during the crimes; and other evidence of the offenses.

22.     Evidence of calls and text messages made by, to and among the members of this conspiracy in the course of the events described in this Affidavit is expected to be disclosed by the requested search. By analyzing this call activity, agents may be able to determine where other accomplices were in the area, and if there were communications between accomplices during the commission of the crime.

23.     This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

        a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

16

portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.     Searching for the evidence described in Attachment A to the Subject Telephone search warrant may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence

17

without requiring a time consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the device using whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

25.    Based on the foregoing, I believe that probable cause exists to believe that ANTHONY VETRI, MITESH PATEL, MICHAEL VANDERGRIFT, MICHAEL MANGOLD, ALLEN CARTER and others known and as yet unknown, have committed violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(j), and that evidence of these violations exists in the Subject Telephone.

MATTHEW YAEGER
Special Agent
Federal Bureau of Investigation

Sworn to before me
this 2⁴ day of October, 2017

HONORABLE JACOB P. HART
*United States Magistrate Judge*

18

## ATTACHMENT A: ITEMS TO BE SEIZED

1. All records that relate to violations of 21 U.S.C. § 846 (conspiracy to distribute
   controlled substances), 18 U.S.C. § 924(j) (murder in the course of using and carrying
   a firearm during and in relation to a drug trafficking crime), 18 U.S.C. § 1951 (Hobbs
   Act robbery) and 18 U.S.C. § 922(g) (felon in possession of a firearm), including:

   a. All documents in electronic form, including correspondence, records,
      opened or unopened emails, text messages, voicemail messages, call logs,
      chat logs, internet history, GPS data and map history pertaining to the
      planning or commission of drug trafficking offenses, robberies or murders;
      the possession of firearms or ammunition; and the distribution,
      expenditure or location of proceeds of drug trafficking offenses, robberies
      or murders;

   b. Photographs relating to the planning or commission of drug trafficking
      offenses, robberies or murders or possession of firearms or ammunition,
      including photographs of ANTHONY VETRI, MITESH PATEL,
      MICHAEL VANDERGRIFT, MICHAEL MANGOLD, ALLEN
      CARTER and their coconspirators/accomplices; the victims of their
      crimes; clothing worn during the crimes; weapons and other items used
      during the crimes; the proceeds of their crimes; and items purchased with
      the proceeds of the crimes.

   c. Address books and calendars.

2. Evidence of user attribution showing who used or owned the device at the time the
   things described in this warrant were created, edited, or deleted, such as logs,

A-1

phonebooks, saved usernames and passwords, documents, and browsing history. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, but not limited to the following:

a.   Any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

b.   All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system, including any and all electronic data which can be collected, analyzed, created, displayed, converted, stored, concealed, or transmitted, or similar computer impulses or data.

c.   Stored electronic information and communications, including but not limited to, telephone or address directory entries consisting of names, addresses and telephone numbers; logs of telephone numbers dialed, telephone numbers of missed calls, and telephone numbers of incoming calls; schedule entries; stored memoranda; stored text messages; stored photographs; store audio; and stored video.

3.  Evidence and contents of logs and files on the device, such as those generated by the device's operating system, which describes the history and use of the device, including but not limited to files indicating when files were written, were opened, were saved, or were deleted. Evidence tending to show the identity of the person using the device at the time any actions relating to the above offenses were taken.

A-2

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Matthew Yaeger, being duly sworn under oath and deposed, state the following:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Philadelphia, Pennsylvania Division. I have been a Special Agent of the FBI for more than 11 years. I am currently assigned to the Philadelphia Violent Crime squad and have been for approximately the past 3 years. For the previous 5 years, I was assigned to the Organized Crime squad. For approximately 3.5 years prior to that, I was assigned to the Violent Crimes/Major Offenders squad in the FBI's Milwaukee, Wisconsin Division. In the course of my work, I have investigated violations of federal law being committed by violent offenders and criminal organizations, including murders, robberies, drug offenses, racketeering, gambling offenses, firearms offenses, and money laundering offenses.

2. This affidavit is being submitted in support of applications for search warrants for information relating to the Google accounts listed below (collectively, the "Subject Accounts"), which is stored at premises controlled by Google, Inc. ("Google"), an electronic communication and/or remote computing services provider headquartered in Mountain View, California. The information to be searched is described in the following paragraphs and in Section I of Attachment A to the respective warrants, and is limited to the time period of October 1, 2011 through January 31, 2012. The applications seek search warrants under 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), to require Google to disclose to the government copies of the information further described in Section II of Attachment A. Upon receipt of the information described in Section II of Attachment A, government-authorized persons will review that information to locate the items described in Section III of Attachment A. The Subject Accounts are as follows:

1

a.    Google account "avetri.mns@gmail.com" (**Subject Account 1**) and Google account "anthonyajelectric@gmail.com" (**Subject Account 2**), believed to be used by ANTHONY VETRI;

b.    Google account "mvgp9448@gmail.com", IMEI 359116037381770 (15 digit IMEI) and/or IMEI 35911603738177 (14 digit IMEI) (**Subject Account 3**), believed to be used by MICHAEL VANDERGRIFT;

c.    Google account "whitemike1002@gmail.com" (**Subject Account 4**), believed to be used by MICHAEL MANGOLD, a.k.a. "White Mike";

d.    Google account "djstrilla@gmail.com" (**Subject Account 5**) and Google account "djstrilla198@gmail.com" (**Subject Account 6**), believed to be used by ALLEN CARTER, a.k.a. "Strilla";

e.    Google account "mpatel215@gmail.com" (**Subject Account 7**), believed to be used by MITESH PATEL.

3.    This affidavit is based upon my personal knowledge, experience and investigation, as well as information related to me directly or through reports of other FBI agents, FBI task force officers, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) investigators, Drug Enforcement Administration (DEA) investigators, Philadelphia Police Department (PPD) officers, and other law enforcement officers in the course of their official duties. Throughout this affidavit, reference will be made to "agents," referring to those federal, state and local law enforcement officers who have directly participated in the investigation, and with whom I have had regular contact.

4.    Because this affidavit is submitted for the limited purpose of obtaining search warrants, I have not included all information known by me or other agents concerning this

2

investigation. I have set forth only those facts that I believe are essential to establish the necessary foundation for the search warrants. This affidavit does not exhaust my knowledge or that of other agents of the facts and circumstances surrounding this investigation.

5. This investigation has determined that ANTHONY VETRI, MITESH PATEL, MICHAEL VANDERGRIFT, MICHAEL MANGOLD, ALLEN CARTER and others known and as yet unknown, were engaged in a large-scale Oxycodone distribution ring, in violation of 21 U.S.C. § 846 (conspiracy to distribute controlled substances). As part of the conspiracy, VETRI, VANDERGRIFT, MANGOLD and CARTER committed, aided and abetted and/or acted as accessories to the murder of another member of the conspiracy (GBOLAHAN OLABODE), in violation of 18 U.S.C. § 924(j) (murder in the course of using and carrying a firearm during and in relation to a drug trafficking crime).

6.     ' Oxycodone is a Schedule II controlled substance under the Controlled Substances Act (21 U.S.C. § 801, *et seq.*). As such, the only way for a pharmacy to legally dispense Oxycodone is upon receipt of a prescription that was issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. (*See* 21 C.F.R. § 1306.04(a).)

7. Based on numerous interviews and a review of financial records, business records, police reports and electronic evidence, I am aware of the following: MITESH PATEL was a licensed pharmacist who operated multiple pharmacies, including Dava Pharmacy in Lansdowne, Pennsylvania (PA) and Welsh Pharmacy in Philadelphia, PA. GBOLAHAN OLABODE, a.k.a. "Bo," who was not a licensed pharmacist, was PATEL's "silent partner" in the pharmacies. Multiple cooperating witnesses in this investigation stated that PATEL illegally

3

distributed Oxycodone 30 milligram (mg) pills from his pharmacies. For example, Cooperating Witness 1 (CW1) provided the following information:

a. PATEL provided CW1 with Oxycodone 30mg pills in order for CW1 to resell them.[1] Beginning in approximately 2008, PATEL gave CW1 one to three bottles of Oxycodone 30mg pills at a time, one to three times per month. The frequency with which CW1 received pills and the quantities of pills he received varied over time.

b. CW1 would resell the pills, take $100 for himself and give the remaining proceeds to PATEL. The bottles were not the amber-colored prescription bottles that pharmacies typically provide to customers. Instead, the bottles were white and had a foil seal on the top.

c. Sometimes CW1 gave PATEL fraudulent prescriptions to cover the transaction; other times, PATEL gave the pills to CW1 without any prescription.

d. At some point, PATEL stopped contacting CW1 for a period of time. At some point after Olabode was killed, PATEL asked CW1 to resume selling pills. From that point until approximately June 2013, PATEL provided pills to CW1 for resale, in a manner similar to their previous dealings.

e. On occasion and at PATEL's instruction, CW1 would deposit the proceeds of the drug sales into a bank account PATEL controlled (as opposed to delivering the money to PATEL directly).

---

[1] CW1 has not been charged with a crime for his dealings with PATEL. CW1 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW1 provided. I believe CW1's information to be truthful and reliable, as it has been corroborated by other witnesses, financial records and bank surveillance video.

8. Evidence gathered in this investigation shows that, as of early-to-mid 2009, PATEL was illegally supplying Oxycodone pills to GBOLAHAN OLABODE and ANTHONY VETRI (in addition to CW1). For example, Cooperating Witness 2 (CW2) provided the following information:

a. VETRI supplied CW2 with large quantities of Oxycodone 30mg pills, beginning in approximately 2008.[2] The pills VETRI provided to CW2 were in sealed bottles, with 100 pills in each bottle. To help CW2 sell the pills he was receiving from VETRI, CW2 contacted MICHAEL VANDERGRIFT and ALLEN CARTER, who he knew from childhood. VANDERGRIFT would set up the sales, sell some himself, and have CARTER distribute the rest.

b. After dealing with VANDERGRIFT for approximately four to six months, CW2 began supplying VANDERGRIFT with more pills - their transactions went from 100-200 pills every other week to 500-600 pills each week. However, VETRI's sales to CW2 were inconsistent, and CW2 had trouble moving the pills during a period of time that VANDERGRIFT was in jail, which CW2 believed to be for more than a year (Affiant's Note:

---

[2] CW2's sister is currently engaged to ANTHONY VETRI. CW2 was convicted in the Southern District of Florida of Attempting to Possess With Intent To Distribute Oxycodone, stemming from the Oxycodone distribution with his Florida supplier. CW2 was sentenced to 51 months incarceration originally, but the sentence was later reduced to 41 months after the United States Sentencing Commission reduced the guidelines for CW2's offense. CW2 has completed his period of incarceration. CW2 has not been charged for his drug distribution with VETRI and PATEL. In addition, CW2 was not charged for his role in arranging for VANDERGRIFT and MANGOLD to rob one of CW2's former drug customers (CW2 told the government that VANDERGRIFT committed the robbery, but CW2 initially did not disclose his own involvement; CW2 later admitted his role in the robbery). CW2 has received an informal immunity agreement relating to these offenses. CW2 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW2 provided. I believe CW2's information to be truthful and reliable, as it has been corroborated by other witnesses, police reports and other evidence. In addition, CW2 testified under oath before a federal grand jury. If CW2 were to perjure himself, it would not be covered by his immunity agreement and he would be exposed to criminal liability.

5

VANDERGRIFT was in jail for a period of time starting around July 2009 and ending in September 2010).

c.    Initially, VETRI sold the pills to CW2 for $14 per pill, but VETRI dropped his price to $11 or $12 per pill after CW2 complained that he was not making any money. CW2 paid VETRI up front for the pills he received from VETRI. CW2 in turn sold the pills to VANDERGRIFT for $15 per pill.

d.    VETRI told CW2 that PATEL, owner of Dava Pharmacy, was his supplier, and that he was supplying VETRI with 2,400 pills every week to every other week. CW2 knew that VETRI and PATEL initially were illegally selling Percocet 10mg pills, but that they weren't making enough money, so they began selling large quantities of Oxycodone 30mg. PATEL sold the Oxycodone to VETRI, who gave most of what he received to CW2 to sell.

e.    CW2 stated that VETRI was inconsistent in getting the Oxycodone from PATEL, which led CW2 to find a second source of supply. Accordingly, in late-2009 or early winter of 2010, CW2 developed a source of Oxycodone 30mg pills in Florida, and also distributed the pills he received from his Florida source through VANDERGRIFT and CARTER. After CW2 obtained his Florida source of supply, CW2 still received pills from VETRI on several occasions. The last time VETRI provided pills to CW2 was at the end of 2010 or beginning of 2011.

f.    CW2 received the Oxycodone from VETRI at VETRI's residence, which was located in Essington, PA at the time. CW2 met PATEL approximately eight to nine times at VETRI's residence. During the times that CW2 was at

6

VETRI's residence, CW2 saw PATEL come into the residence carrying a bag. Each time, VETRI went into another room with PATEL, and then PATEL would leave and VETRI would come out and remove manufacturer's bottles of Oxycodone 30mg from the bag PATEL had brought into VETRI's home. VETRI would then take the pills out of the manufacturer's bottles and put them into a large plastic bag for CW2 so that he could hide them.

g.   CW2 stated that VETRI told him that PATEL and GBOLAHAN OLABODE were business partners in Dava Pharmacy together. VETRI told CW2 that OLABODE was purchasing Oxycodone from PATEL, and that the reason VETRI couldn't get more pills from PATEL was that OLABODE was paying PATEL more money for the pills.

h.   CW2 stated that after about a year of receiving Oxycodone from his Florida source, CW2, VANDERGRIFT and CARTER were stopped by DEA when they were flying to deliver money to CW2's Florida source to purchase Oxycodone. Approximately $40,000, being carried in parts by each of them, was seized from them by DEA (Affiant's Note: Your affiant knows that on February 10, 2011, pursuant to a consensual encounter with CARTER, VANDERGRIFT, and CW2 at the Fort Lauderdale-Hollywood International Airport, DEA agents/officers seized $15,040 from CARTER, $15,040 from VANDERGRIFT, and $11,690 from CW2).

i.   CW2 believes that after he was stopped at the airport, no one would deal with him out of fear that he was cooperating with DEA. Thereafter, CW2 believed

7

that VANDERGRIFT began getting pills directly from VETRI, who was still getting them from PATEL.

9.     Cooperating Witness 3 (CW3) received a large amount of Oxycodone pills from OLABODE.  CW3 provided the following information:

a.     CW3 stated that he became friendly with OLABODE because OLABODE was a bouncer at a nightclub that CW3 frequented.[3]  CW3 also worked out at the same gym as OLABODE.  CW3 knew that OLABODE was involved in bodybuilding and took illegal steroids to supplement his workouts.  CW3 also knew OLABODE to illegally sell human growth hormone (HGH) because he purchased HGH from OLABODE on several occasions.

b,     In or around February 2010, CW3 approached OLABODE and asked OLABODE if CW3 could illegally obtain Oxycodone pills from OLABODE, some of which CW3 intended to use personally and the rest of which he intended to sell to support his addiction to Oxycodone.  OLABODE sold CW3 eight to 12 bottles of Oxycodone 30mg pills at first.  During later transactions, OLABODE "fronted" CW3 multiple bottles of pills at a time, and CW3 paid OLABODE after he sold the pills.  The pills that OLABODE provided to CW3 were still in their manufacturer's bottle, each of which contained 100 pills.

---

[3] CW3 stated he cooperated with law enforcement, even though it exposed him to criminal liability, in an effort to help solve the murder of OLABODE, who was CW3's friend.  CW3 has not been charged for his drug distribution with OLABODE.  CW3 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury.  The information presented in this affidavit is a summary of the information CW3 provided.  I believe CW3's information to be truthful and reliable, as it has been corroborated by other witnesses.

c.    CW3 obtained pills from OLABODE for approximately 2 years (beginning in approximately February 2010). During that time period, CW3 and OLABODE occasionally took breaks from dealing with one another. During the times when CW3 got pills from OLABODE, CW3 received multiple bottles of 100-count pills at a time.

d.    CW3 stated that there was an occasion when OLABODE gave him an entire case of Oxycodone 30mg pills. The case had the name of the pharmacy from which it came along with a sticker price on the bottles. CW3 says that he did not know the name of the pharmacy, but knows that it was in Lansdowne, PA. (Affiant's Note: An employee at Amerisource Bergen, one of the wholesale suppliers of Oxycodone 30mg pills for Lansdowne and Welsh Pharmacies, informed agents that Amerisource receives Oxycodone 30mg pills in several ways, including in a case of 24 loose bottles; 12 loose bottles; 24 bottles shrink-wrapped in two 12-bottle increments; and 48 bottles shrinkwrapped in eight six-bottle increments. When shipping out the packages to their customers, they might keep the integrity of the initial packaging depending on the number of bottles ordered.)

e.    OLABODE told CW3 that he had a partner with whom he had to split the money (meaning the money he made from selling pills). CW3 stated he later learned that OLABODE was a partner in a pharmacy with an individual named "Mitesh" (known by agents to be MITESH PATEL).

f.    Prior to getting pills from OLABODE, CW3 got pills from CW2. CW3 believed CW2 received his pills from ANTHONY VETRI.

9

10.     On January 4, 2012, OLABODE was murdered outside of his home in

Lansdowne, PA. Shortly after OLABODE got out of his car, two males approached him and

shot him numerous times. Law enforcement recovered 27 spent shell casings from the scene –

15 from a .40 caliber gun and 12 from a 9 millimeter (mm) gun. Based on information obtained

from, among other sources, multiple cooperating witnesses and a review of electronic devices

used by VETRI and VANDERGRIFT, agents learned that VANDERGRIFT and MANGOLD

shot and killed OLABODE on January 4, 2012. CARTER was with them that evening, but not

present at the time of the shooting. They carried out the murder at the request of VETRI, who

wanted OLABODE murdered so that he would receive a larger supply of pills from PATEL.

VETRI gave VANDERGRIFT information about OLABODE and promised to supply him with

Oxycodone pills for resale at a reduced price as payment for the murder. For example, CW4

provided the following information[4]:

> a.     CW4 grew up with VANDERGRIFT. CW4 and VANDERGRIFT were
>
> cellmates at the Philadelphia Federal Detention Center (FDC) for
>
> approximately 2 months, and were housed in the same unit for another 4 to 5
>
> months after that. During these months together, VANDERGRIFT told CW4
>
> details about a murder he committed. The following is a summary of the
>
> information VANDERGRIFT told CW4. Unless otherwise indicated, all of
>
> the information was told to CW4 by VANDERGRIFT.

---

[4] CW4 has been convicted of Distribution of Oxycodone in the Eastern District of Pennsylvania, and is currently awaiting sentencing. CW4 has cooperated with the government in an effort to reduce his exposure at the time of sentencing. CW4 provided information to law enforcement during multiple interviews and testified under oath before a federal grand jury. The information presented in this affidavit is a summary of the information CW4 provided. I believe CW4's information to be truthful and reliable, as it has been corroborated by other witnesses and other evidence.

b.     VANDERGRIFT and "White Mike" (MIKE MANGOLD) killed a man named "Bo" (GBOLAHAN OLABODE).  The murder happened shortly after New Year's (maybe January 4) in Lansdowne, Pennsylvania.  They killed him in a parking lot behind his home after he got out of his car.  VANDERGRIFT and MANGOLD shot at Bo 28 or 29 times, and hit him 13 or 14 times.

c.     VANDERGRIFT used a 9mm handgun and MANGOLD used a .40 caliber handgun during the murder.  CARTER's cousin straw-purchased the 9mm handgun for VANDERGRIFT.  VANDERGRIFT and MANGOLD got the .40 caliber handgun when they burglarized the house where Nick Dellapolla was living.  After the murder, they swapped the guns in deals that were set up by TRG gang members that MANGOLD knew.  TRG is an Asian gang in South Philadelphia. [5]

d.     VANDERGRIFT committed the murder because ANTHONY VETRI told him that he would make money through pill sales (Oxycodone 30mg pills).  VETRI was a pill dealer that VANDERGRIFT knew.  VETRI was friends with a pharmacist who was an Indian male.  [NOTE: CW4 stated VANDERGRIFT told him the pharmacist's name, but CW4 forgot it.  Agents know the pharmacist to be MITESH PATEL.  To avoid confusion, he will be referred to as PATEL hereinafter, even though CW4 did not recall his name during the interview.]  Bo was partners with the pharmacist and Bo was

---

[5] Police reports indicate that the burglary/gun theft occurred on November 20, 2011.  CW3 owned the house and it was CW3's gun that was stolen during the burglary – a .40 caliber Taurus handgun, serial number SYL61919.  On October 21, 2015, the Philadelphia Police Department recovered CW3's gun during a traffic stop in South Philadelphia (the individuals in the car are not believed to be related to this investigation).  A ballistic examination was conducted, and it was determined that the .40 caliber shell casings found at the scene of OLABODE's murder were fired from CW3's stolen gun.

selling pills to Nick Dellapolla and CW3. VETRI told VANDERGRIFT that if he killed Bo, the pharmacist would sell the pills to VETRI. VANDERGRIFT told CW4 that VETRI had supplied pills to CW2, and that CW2 had supplied pills to VANDERGRIFT.

e.   VETRI told VANDERGRIFT he would sell the pills to VANDERGRIFT at a "good price" or "nice price" (VANDERGRIFT did not tell CW4 a dollar figure). VANDERGRIFT would then sell the pills and make a profit. VETRI came to VANDERGRIFT's house a day or two before the murder and said he'd give VANDERGRIFT a better price on the pills than they had previously discussed, but the murder has to happen now. VANDERGRIFT did not say why VETRI wanted Bo killed so urgently.

f.   VETRI told VANDERGRIFT everything about Bo, including his address. Bo was an African male (CW4 believes VANDERGRIFT said Bo was Nigerian, but CW4 is not positive). Bo was a large man and was known to carry a gun (which is why they didn't try to rob him). Bo's home was a duplex with apartments, and he lived at the top of a fire escape. Bo drove an Infiniti. For that reason, VANDERGRIFT and MANGOLD got Infiniti tattoos on their necks after the murder.[6]

g.   VANDERGRIFT waited for VETRI to get pills from PATEL, but VANDERGRIFT ended up getting arrested about 1 week after the murder.[7] At the time, VANDERGRIFT was living in a house that VETRI owned in

---

[6] I am aware that VANDERGRIFT and MANGOLD both got tattoos of the Infiniti logo following the murder. MANGOLD has since covered his Infiniti logo with other tattoos.

[7] VANDERGRIFT was arrested on January 19, 2012 (the murder was on January 4, 2012).

12

Chester, on 22nd or 23rd Street.  When VANDERGRIFT was in jail, VETRI

let VANDERGRIFT's girlfriend live in the house rent free because

VANDERGRIFT and VETRI plotted the murder together.[8]

11.    MICHAEL MANGOLD has pled guilty to an Information charging him with,

among other offenses, violations of 21 U.S.C. § 846 (conspiracy to distribute controlled

substances) and 18 U.S.C. § 924(j) (murder in the course of using and carrying a firearm during

and in relation to a drug trafficking crime).  ALLEN CARTER has pled guilty to an Information

charging him with, among other offenses, violations of 21 U.S.C. § 846 and 18 U.S.C. § 3

(accessory after the fact to murder).  MANGOLD and CARTER have admitted their

participation in the murder of OLABODE and have provided detailed descriptions of

VANDERGRIFT and VETRI's roles in the murders (their descriptions are similar to the

description provided by CW4).

12.    On May 31, 2017, a federal grand jury in the Eastern District of Pennsylvania

returned a Second Superseding Indictment, charging VETRI, PATEL and VANDERGRIFT with

violations of 21 U.S.C. § 846; charging VETRI and VANDERGRIFT with violations of 18

U.S.C. § 924(j); and charging PATEL with tax and money laundering offenses.

13.    Agents obtained historical cell site records from AT&T for VETRI's phone

number, 484-645-3668.  The subscriber name was listed as "A & J Electric & Lighting Design."

I am aware that VETRI is an electrician who owned a lighting company named "A & J Electric."

The records indicate that VETRI listed "avetri.mns@gmail.com" as the email address for his

AT&T account (**Subject Account 1**).  On June 4, 2013, agents executed a federal search warrant

at VETRI's residence.  One of the items seized was an Apple iPhone that was identified as

---

[8] VANDERGRIFT's girlfriend (Larae Laws) testified before a federal grand jury that she did not pay rent to VETRI
from the time that VANDERGRIFT was arrested (January 19, 2012) until the time she moved out (June 2013).

13

belonging to VETRI, bearing phone number 484-645-3668. The phone contained text messages

between VETRI and VANDERGRIFT dating back to the October 2011 to January 2012 time

period. The Apple ID assigned to the phone was "avetri.mns@gmail.com." The Gmail account

"anthonyajelectric@gmail.com" was also listed in the phone as a user account (**Subject Account**

**2**). Agents also seized another iPhone that appeared to be older, with no active phone number

assigned. In that phone, "avetri.mns@gmail.com" and "anthonyajelectric@gmail.com" were

again listed as user accounts, and the phone contained emails sent to those accounts during the

time period of the conspiracy.

    14.    On January 19, 2012, MANGOLD, VANDERGRIFT and CARTER were arrested

by Pennsylvania State Police (PSP) Troopers during a traffic stop. The arresting officer seized

phones belonging to the subjects, and a federal search warrant was subsequently executed on the

phones.

    a.    For VANDERGRIFT's phone, the Google account "mvgp9448@gmail.com"

was listed in the phone as a user account. The phone contained emails sent to

and from that account during the time period of the conspiracy, and contained

text messages related to illegal activities.[9] The phone is assigned International

Mobile Equipment Identity number (IMEI) 359116037381770 (15 digit

IMEI). I am aware that come phone companies' record processing systems

sometimes arbitrarily assign the number "0" as the last digit for a phone's

IMEI, and that it is sometimes necessary for Google to search based on the

---

[9] VANDERGRIFT's email account (mvgp9448@gmail.com) was also listed in VETRI's cell phone under the contact name "Mike Vandergrif." The same email account was listed as a user account in an iPad that VANDERGRIFT used, which agents obtained from his girlfriend. That iPad contained an email between mvgp9448@gmail.com and VETRI's email address (avetri.mns@gmail.com).

first 14 digits of the IMEI (in this case, 35911603738177). Collectively, the email address and IMEI are referred to herein as **Subject Account 3**.

b.   For MANGOLD's phone, the Google account "whitemike1002" (**Subject Account 4**) was listed in the phone as a user account. The phone contained an email sent to that account during the time period of the conspiracy. I am aware that "White Mike" is a commonly used nickname for MANGOLD.

c.   The arresting officer seized two phones belonging to CARTER. The Google account "djstrilla@gmail.com" (**Subject Account 5**) was listed as a user account in one phone, and the Google account "djstrilla198@gmail.com" (**Subject Account 6**) was listed as a user account in the other phone. The phones contained emails and/or calendar entries for those accounts during the time period of the conspiracy. I am aware that CARTER sometimes worked as a DJ under the stage name "Strilla."

15.   Agents obtained historical cell site records from AT&T for PATEL's phone number, 610-299-2080. The records indicate that PATEL listed "mpatel215@gmail.com" as one of the email addresses for his AT&T account (**Subject Account 7**).

## BACKGROUND CONCERNING GOOGLE ACCOUNTS

16.   From training and experience, as well as information provided to me by other investigators, I have learned that Google provides email access and many other online services and products to the public. Google's email service, known as Gmail, allows users to obtain email accounts at the domain name gmail.com. To use Gmail, one must create an account by registering with Google.

15

17.     From training and experience, as well as information provided to me by other investigators, I have learned that the Google account needed to access Gmail can also be used for many other online services provided by Google. To name a few, these include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Picasa Web Albums (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search), and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); and online publishing and development tools such as Blogger (weblog publishing), Google Domains (domain hosting and website publishing), and Google Developers (open source code and project hosting for coding).

18.     From training and experience, as well as information provided to me by other investigators, I have learned that a subscriber's Google account can be used not only for email but also for other types of electronic communication, including voice calls, video chats, SMS text messaging, instant messaging, social networking, and photo and video sharing. Depending on user settings, these messages and associated content are normally stored on Google's servers until deleted by the subscriber. Similar to emails, they could remain on Google's servers indefinitely if not deleted by the subscriber, and even after being deleted, they may continue to be available on Google's servers for a certain period of time. Furthermore, a Google subscriber

16

can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on Google's servers. I know that evidence of who owned or was using a Google account may be found within such computer files and other information created or stored by the Google subscriber.

19.     From training and experience, as well as information provided to me by other investigators, I know that Google asks subscribers to provide certain personal identifying information when registering an account. Such information can include the subscriber's full name, physical address, telephone numbers, alternative email addresses, and other identifiers. Paying subscribers also must provide means and source of payment, such as credit card or bank information. Based on my training and experience, such information may constitute evidence of the crimes under investigation because it can help identify who owned or was using the Google account. From training and experience, I know that even if subscribers provide false information in order to conceal their identity, this information often still provides clues to their identity, location, or unlawful activities. Furthermore, I am aware that Google sometimes verifies a subscriber's email address or telephone number for purposes of future password recovery.

20.     From training and experience, as well as information provided to me by other investigators, I know that Google typically retains transactional information about the creation and use of each Google account. This can include the date and time when the account was created, the length of service, records of login or session times and durations, the types of service utilized, methods used to connect to the account, and other log files reflecting account usage. In particular, Google keeps a record of IP addresses used to register and access the account, including the IP address used for each login or session. Because every device that connects to

17

the Internet must use an IP address, such information can help to identify which computers or other devices were used to access the Google account.

21.    From training and experience, as well as information provided to me by other investigators, I know that Google also collects information relating to the devices used to access a subscriber's account - such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Google in order to track what devices are using Google's accounts and services. Examples of these identifiers include Android ID, Advertising ID, unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). From my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Google accounts created or accessed by the same device and likely belonging to the same individual, (b) to find accounts at other providers linked to the same device and individual, and (c) to determine whether a particular device recovered during the course of the investigation was used to access the Google account.

22.    From training and experience, as well as information provided to me by other investigators, I know that Google uses cookies and similar technologies to track users visiting Google's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When

18

that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Google. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by Google may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Google account and determine the scope of criminal activity.

23.     From training and experience, as well as information provided to me by other investigators, I know that sometimes Google account users communicate directly with Google about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services. Based on my training and experience, such information may constitute evidence of the criminal activity under investigation because it can be used to identify the email account's user or users.

24.     From training and experience, as well as information provided to me by other investigators, as explained herein, communications and other information stored in connection with a Google account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal activity under investigation, thus enabling the United States to establish each offense element, or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with a Google account can reveal who has used or controlled that account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example,

19

electronic communications, contact lists, location history, internet browsing history, and saved images or documents - and metadata associated with the foregoing, such as date, time, location, IP address, and device information - may indicate who used or controlled the account. Furthermore, records maintained by Google can show how and when the account was accessed or used. For example, by determining locations associated with logged IP addresses, investigators can understand the chronological and geographic context of account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).

25.     From training and experience, as well as information provided to me by other investigators, information created or stored by someone using a Google account may provide relevant insight into the account owner's state of mind regarding the criminal conduct under investigation. For example, electronic communications may indicate the owner's motive and intent to commit a crime (e.g., emails or web searches relating to the crime), or consciousness of guilt (e.g., deleting emails to conceal them from law enforcement).

26.     Because this warrant will be served on Google who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

27.     Based on the foregoing, I believe that probable cause exists to believe that ANTHONY VETRI, MITESH PATEL, MICHAEL VANDERGRIFT, MICHAEL MANGOLD, ALLEN CARTER and others known and as yet unknown, have committed violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(j), and that evidence of these violations exists in the locations

20

described in paragraph 2 above. More specifically, obtaining the requested information such as location information will help to establish the physical location of the conspirators during significant moments within the charged conspiracy. The information may also provide evidence of meeting places, distribution locations, and areas where evidence had been stored or disposed of. Moreover, the investigation has revealed that, specifically as to the murder of Olabode, some of the conspirators performed web/internet searches relating to people, places and/or things relating to the murder. Obtaining evidence of such actions would corroborate witnesses and support the charged offenses at trial. Moreover, the investigation revealed that several of the conspirators used email accounts, text messages, photographs and video recordings during communications with each other and with others. Such material, including contact content, means of communication, and date/time/location of communication would corroborate witnesses and support the charged offenses at trial.

MATTHEW YAEGER
Special Agent
Federal Bureau of Investigation

Sworn to before me
this **2╫** day of October, 2017

HONORABLE JACOB P. HART
*United States Magistrate Judge*

21

## ATTACHMENT A

### I. Subject Account and Execution of Warrant

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with (the "Subject Account"), and any other accounts associated by cookie, for the time period October 1, 2011 through January 31, 2012.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II. Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, regardless of whether such information is stored, held, or maintained inside or outside of the United States, and including any records, files, logs or information that has been deleted but is still available to the Provider, the Provider is directed to produce the following information associated with the Subject Account, for the time period October 1, 2011 through January 31, 2012:

a.      Location history for the Subject Account, whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation precision measurement information such as timing advance or per call measurement data, and Wi-Fi location.  Such data shall include the GPS coordinates, the dates and

A-1

times of all location recordings, and origin of how the location recordings were obtained and estimated radius;

b.    Web search history, including, but not limited to, mobile and desktop browser searches;

c.    Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Maze services;

d.    The contents of all text messages (SMS and MMS), voicemails, recorded calls, emails, chat messages and other electronic communications associated with the Subject Account, including stored or preserved copies of chat logs, emails sent to and from the account, draft communications, the source and destination addresses associated with each communication, the date and time at which each communication was sent, and the size and length of each communication;

e.    All records or other information regarding the identification of the Subject Account subscriber and/or user(s), to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, login IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

f.    All records and other information concerning any Android device ever associated with the Subject Account, including hardware and service provider information,

A-2

all apps that have been downloaded to the device, location history, any backup or cloud copies of data stored on the device, and basic subscriber information for all Google accounts ever tied to the device;

g.    All device information associated with the Subject Account; and

h.    All records or other information stored at any time by an individual using the Subject Account, including address books, contact and buddy lists, bookmarks, calendar data, pictures, videos, documents, files and any other saved information.

## III.    Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 18 U.S.C. § 924(j) (murder in the course of using and carrying a firearm during and in relation to a drug trafficking crime), including the following:

a.    The identity of the person who created the Subject Account, and the identity of person(s) who communicated with the account about matters relating to the criminal offenses above, including full names, physical addresses, telephone numbers and other identifiers, the date on which the account was created, the means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other

identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files, and log-in IP addresses associated with session times and dates;

b.    The email address(es) associated with the Subject Account;

c.    The contents of all files, documents, images, videos and communications (including calls, voicemails, text messages, and emails) regarding the criminal offenses above; and

d.    Evidence of the account user's location.